UNITED STATES of America

v.

Michael JACQUES, Defendant.

Case No. 2:08–cr–117.

United States District Court,
D. Vermont.

May 4, 2011.

Craig S. Nolan, AUSA, William B. Darrow, AUSA, United States Attorney's Office, Rutland, VT, for United States of America.

### OPINION and ORDER Re: Defendant's Motion to Suppress Oral and Written Statements

WILLIAM K. SESSIONS III, District Judge.

Defendant Michael Jacques, who stands accused of kidnapping and murdering Brooke Bennett, has moved to suppress oral and written statements obtained from him by a government agent, Michael Garcia. Mot. to Suppress, ECF No. 204. Garcia, a friend and former co-worker of Jacques, began acting as Government agent after Jacques contacted him from prison, seeking help with a plan to fabricate exculpatory evidence. Jacques argues that introduction of these statements, either at the guilt phase or penalty phase of his capital trial, would violate his Sixth Amendment right to counsel under *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). For the reasons that follow, the motion is **granted in part** and **denied in part.** The statements made by Jacques prior to July 16, 2008, when Garcia began acting as a government agent, are admissible. To the extent they make reference to the charged criminal conduct, the statements obtained after Garcia began acting as a government agent on July 16 will be excluded from the guilt phase and, if the trial proceeds to the penalty phase, from that proceeding as well. The Government will be given the opportunity to submit for the Court's review "sanitized" versions of the statements, "scrubbed" of all reference to the charged criminal conduct, which the Court will consider admitting at the penalty phase.

### Factual Background

The facts set forth below are undisputed, except where otherwise noted.

On June 29, 2008, Jacques was arrested on a state court charge of sexual assault. On July 1, a federal complaint charging Jacques with the kidnapping of Brooke Bennett was filed with this Court and a federal warrant for his arrest issued. At his initial appearance on July 7, the Federal Public Defender for the District of Vermont was appointed to represent Jacques on the federal kidnapping charge, and Jacques was ordered detained.

On July 10, 2008, from the Northwest State Correctional Facility, Jacques telephoned Michael Garcia in Chandler, Arizona. Garcia and Jacques had worked together in New Hampshire for several years and were close friends. The call was taped in the normal course of business at the facility. During the call Jacques asked for Garcia's mailing address and appealed for help. He explained that he could not discuss the help he needed on the monitored phone and asked Garcia to call him on the attorney line by telling jail staff that he was an attorney representing

Jacques in a civil matter. He also asked Garcia to visit him in person as soon as possible.

In an envelope postmarked July 11, Jacques mailed Garcia two letters, which were dated July 4 and July 8. In the first letter Jacques pleaded for Garcia's help and asserted he was innocent. In the second letter he also suggested that Garcia call the facility on the attorney line and claim to be Jacques's lawyer on a civil matter.

On July 11, Garcia contacted the U.S. Attorney's Office for the District of Vermont and informed Assistant United States Attorney ("AUSA") Craig Nolan that Jacques had called him the day before. Nolan had an FBI agent call Garcia back to collect further information about the call. At this time, the Government set up a "taint team." The taint team was a separate team of lawyers and investigators who were to work with Garcia to investigate "whether new, July, 2008 criminal conduct, outside the scope of th[e] representation [on the kidnapping charge], was afoot." Opp'n to Mot. to Suppress at 5 n. 4, ECF No. 225. In particular, the Government suspected that Jacques was contacting Garcia to assist him in covering up his involvement in the kidnapping. The taint team was to "shield[ ] the prosecution team from material it should not receive"—because it was protected by the attorney-client privilege—by disclosing evidence to the primary prosecution team only after sharing that evidence with defense counsel and allowing defense counsel the opportunity to object to disclosure. *Id.*

The taint team registered Garcia as a Confidential Human Source ("CHS") and made it possible for him to call Northwest State Correctional Facility on an attorney line on July 16, July 22, July 24, July 28 and August 1, 2008 and to visit the facility posing as an attorney on July 30 and July 31. The Government recorded the phone calls and meetings without Jacques's knowledge and Garcia turned over to the taint team the letters mailed to him on July 11 as well as subsequent letters dated July 14, July 17, July 19, July 21, July 22, August 1 and August 16. Garcia was compensated for expenses he incurred while serving as a CHS and was paid $5,000.

During the July 16 telephone call, Jacques told Garcia that he was innocent and needed Garcia's help to get out of jail. Jacques explained that J1[1] had become involved in internet role-playing with the people who eventually abducted and killed Miss Bennett and that the members of this internet sex ring were attempting to frame Jacques for the crime. He asked Garcia to send text messages to J1 pretending to be from members of the sex ring. He indicated that these initial contacts with J1 were just the first part of a multi-part plan to prove his innocence and that he would explain the rest of the plan later.

In the July 17, 19, and 21 letters, Jacques expressed disappointment that Garcia had not visited yet and implored him to arrange a visit soon so that Jacques would be able to explain to Garcia his plan, which he hoped would lead to his release by August.

In the July 22 telephone call, Jacques asked Garcia to send a series of text messages to J1 pretending to be from members of the sex ring and telling her that she would be allowed to reveal to authorities that Jacques was not Miss Bennett's abductor. He also indicated that he want-

---

1. "J1" is the moniker used in the Government's documents to refer to a juvenile whom Jacques is alleged to have manipulated into assisting him with the kidnapping of Miss Bennett.

ed Garcia to email Jacques's wife and advised him to disguise the origin of the email by using a secondary hard drive or a public computer terminal. Jacques told Garcia that he would mail him written instructions providing further details of the plan.

In the July 22 mailing, Jacques included the first segment of a sixty-page plan instructing Garcia to send a series of contrived emails, purportedly from members of the internet sex ring, to various people in an effort to discredit the case against Jacques. The emails were to be sent to J1, to Jacques's wife, to the Government, and to media outlets. The communications with J1 were intended to convince her to retract statements she had made to the police inculpating Jacques and to tell them that the internet sex ring was real. The communications to Jacques's wife, the Government and the media were also intended to suggest that the real killers were still at large. According to the Government, Jacques's suggested text for the fabricated emails contained "detailed, accurate, non-public information about the crime to establish the bona fides of the purported sender." Opp'n to Mot. to Suppress 9.

During the July 30 and 31 visits, Jacques asked if Garcia had received the first portion of the packet of instructions and gave him the remaining pages. He reminded Garcia to obtain an external hard drive or to send the emails described in his instructions from a public computer. Jacques explained that J1 had shared with him many of the details of the crime that the members of the sex ring had spoken with her about and that this is why he was able to provide Garcia with information that would convince the recipients of the phony emails that they came from the real culprits. Jacques also suggested the idea of using the attorney phone line to set up a three-way conference call with J1, during which Jacques would use an electronic device to disguise his voice and pretend he was one of the sex ring members. During the meeting, Garcia told Jacques that he had tried to call J1, but that she had not answered her phone.

During the August 1 telephone call, Garcia told Jacques that FBI agents had been waiting at his hotel when he returned from visiting the jail on July 31 and that they had indicated that they were aware he had been posing as an attorney. Garcia said that the FBI agents had mentioned the possibility of bringing obstruction of justice charges against him. Garcia then told Jacques that he did not wish to have any further involvement in the implementation of Jacques's plan. Jacques tried to convince Garcia to continue with the plan but Garcia refused.

In the letters dated August 1 and 16, Jacques asked Garcia if he had implemented any parts of the plan. Garcia did not respond to these letters.

The FBI agent responsible for handling Garcia testified that, when Garcia first became a CHS, he was instructed not to ask Jacques "anything regarding [his] attorney-client privilege or any charges pending[.]" Suppression Hr'g Tr. 45, Dec. 9, 2010, ECF No. 249. "[A]s a general rule [the Government] wanted [Garcia] to essentially just follow Mr. Jacques's lead and not try to initiate any investigation[.]" *Id.* Consistent with the FBI agent's testimony, Garcia recalled his instructions as follows:

> [B]asically, let [Jacques] talk. [D]on't ask questions, avoid asking questions, don't get into detail, be as passive as possible, just let him do as much talking . . . as he's willing to do.

*Id.* at 169. Nevertheless, a recording of the July 22 call indicates that, on that date, Garcia actively questioned Jacques about previous criminal conduct he allegedly committed in Arizona in the 1980s. At the

suppression hearing, Garcia testified that he had not asked these questions at the behest of the Government. Suppression Hr'g Tr. 170. In fact, Garcia believed that asking these questions "was clearly against the instructions that were given to [him,]" but had done so anyway because of his own curiosity. *Id.* In his briefing in support of his motion to suppress, Jacques identifies several other instances in the transcripts of the calls and meetings where Garcia "actively engaged in and encouraged the conversation in an effort to elicit additional information." Def's Supplemental Post–Hr'g Mem. in Support of Mot. to Suppress 4, ECF No. 270.[2] In one particular exchange, when Jacques began discussing how important Garcia would be to the success of his plan, Garcia attempted to redirect the conversation to a discussion of Jacques's prior criminal conduct: "But, uh, we need to back up, and, uh, get a little better idea of what happened ... [Y]ou know I wanna, wanna help but I gotta know what's goin' on so. You know?" Attachment A to Def's Supplemental Post–

Hr'g Mem. in Support of Mot. to Suppress 37, ECF No. 270–1.

The Government notified defense counsel of the taint team's investigation in a letter dated September 11. In the letter, AUSA Gelber, the attorney leading the taint team, wrote that "the Government was aware that the investigation might inadvertently discover material or communications which should be protected by the attorney-client privilege. Therefore, as soon as the Government learned of Jacques' attempt to obstruct justice, it established a 'taint' team to handle the investigation." ECF No. 226–15. Included with the September 11 letter were the letters and written materials obtained by Garcia during the investigation as well as an audio recording of the July 10 phone call Jacques made to Garcia. AUSA Gelber indicated that, unless defense counsel contacted him within ten days to object, he would turn the enclosed materials over to the prosecution team. *Id.* When defense counsel did not object within the ten-day period,[3] the taint team "decided to pass all

---

**2.** For example, Garcia often asked questions to probe statements made by Jacques. *See, e.g.*, Attachment A to Def's Supplemental Post–Hr'g Mem. in Support of Mot. to Suppress 12, ECF No. 270–1 (In response to a statement by Jacques that the true culprits had planted evidence inculpating him in the kidnapping, Garcia asked "[W]hat did they do? What, what kind of evidence?"); *id.* at 14 (When Jacques mentioned the timing of his arrest, Garcia asked, "Hey, uh, was that when they found, is that when they found Brooke, was, somewhere in there?"). Garcia also repeatedly represented to Jacques that he was willing to assist with Jacques's multi-faceted plan to interfere with the investigation into the underlying crime and had even begun implementing the initial steps of the plan. *See, e.g., id.* at 19 ("So, what you need from me, name it."); *id.* at 49 ("Send me [the written plans], um, I'll do the text thing[.]"); *id.* at 56 (In response to specific instructions Jacques gave him on how to contact J1 by phone, Garcia responded "Okay. Piece of cake."); *id.* at 60–61 (When Jacques asked

"[S]o you're on my side and I can count on you?" Garcia responded "Yep."); *id.* at 63 ("I tried, uh, [J1] a couple of times, different texts and, uh, I haven't gotten a response."); *id.* at 140 ("[T]ryin' to get a hold of [J1]. That's [ ] been the tough one though. I actually thought about driving by on my way up here."); *id.* at 174 ("What's plan B then? 'Cause ... look I've tried [to contact J1] probably forty times so far."); *id.* at 182 ("Okay, let me get going, working on [the plan to contact J1] and [ ] I'll give you a call later, okay? Hang in there.").

**3.** On May 22, 2009, defense counsel did formally oppose a motion filed by the taint team on April 10, 2009 to release to the prosecution team redacted transcripts of communications between Garcia and Jacques. *See* Opp'n to Mot. for Release of Redacted Transcripts, ECF No. 103. Defense counsel argued that the transcripts should not be turned over because they had been obtained in violation of the Sixth Amendment right to counsel under

materials which did not concern attorney-client communications 'over the wall'" to the prosecution team. Mot. for Release of Redacted Transcripts 5, ECF No. 88. Over the course of the next several months, after the taint team reviewed the other communications between Garcia and Jacques, it turned these materials over to defense counsel and to the prosecution team. While the taint team made sure that the materials it turned over did not reveal communications "protected by the attorney-client privilege," it did not attempt to excise from the statements references to the charged criminal conduct being prosecuted by the prosecution team.

## Discussion

■ Jacques argues that the Government violated his Sixth Amendment right to counsel by using Garcia as an agent to gather written and oral statements which it now seeks to use in its prosecution of the underlying kidnapping offense. *See Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). He seeks suppression of all written and oral statements he made to Garcia during July and August 2008. Because the undisputed facts indicate that Garcia did not begin acting as a Government agent until July 16, 2008, when he initiated the first recorded call to Jacques on the jail's attorney line, and because *Massiah* applies only to statements obtained by Government agents, Jacques is not entitled to suppression of the statements made prior to July 16. Accordingly the Court's discussion of the suppression motion is limited to the recorded phone calls made on July 16, July 22, July 24, July 28 and August 1; the letters dated July 17, July 19, July 21, July 22, August 1 and August 16; and the recorded in-person visits of July 30 and 31.

*Massiah v. United States*, 377 U.S. 201, 84

The Supreme Court has held that "the government may not use an undercover agent to circumvent the Sixth Amendment right to counsel[.]" *Illinois v. Perkins*, 496 U.S. 292, 299, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990) (citing *Massiah*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246; *United States v. Henry*, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980); *Maine v. Moulton*, 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985)). The threshold question in assessing whether there is a violation of the Sixth Amendment under *Massiah* and its progeny is whether the defendant's right to counsel had attached at the time that he made the statements in question to the government agent. Because Garcia did not become a government agent until after Jacques's arrest and initial court appearance, there is no question that Jacques's Sixth Amendment right to counsel with regard to the kidnapping offense had attached before the statements in question were made. *Brewer v. Williams*, 430 U.S. 387, 398, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977) ("Whatever else it may mean, the right to counsel granted by the Sixth and Fourteenth Amendments means at least that a person is entitled to the help of a lawyer at or after the time that judicial proceedings have been initiated against him—'whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'") (quoting *Kirby v. Illinois*, 406 U.S. 682, 689, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972)).

The Government does not contest that Jacques's right to counsel with regard to the kidnapping prosecution had attached at the time the statements in question were made. Rather, it points out that the Sixth Amendment right to counsel is "offense specific." *McNeil v. Wisconsin*, 501 S.Ct. 1199, 12 L.Ed.2d 246 (1964). *Id.*

U.S. 171, 175, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991). The Government argues that because it was using Garcia to investigate Jacques's alleged post-arrest obstruction of justice, a separate offense with which he had not yet been charged, it did not violate Jacques's Sixth Amendment right to counsel.[4] Defense counsel argues that, although the statements obtained by Garcia would clearly be admissible at a separate trial for obstruction of justice, the statements are inadmissible in the instant case.

To the extent that the Government suggests that, because it was investigating a yet uncharged obstruction offense, introduction of statements obtained by Garcia at Jacques's trial on the underlying kidnapping charge cannot possibly constitute a violation of Jacques's right to counsel, the Supreme Court has rejected this argument:

> [L]aw enforcement officials investigating an individual suspected of committing one crime and formally charged with having committed another crime obviously seek to discover evidence useful at a trial of either crime. In seeking evidence pertaining to pending charges, however, the Government's investigative powers are limited by the Sixth Amendment rights of the accused. To allow the admission of evidence obtained from the accused in violation of his Sixth Amendment rights whenever the police assert an alternative, legitimate reason for their surveillance invites abuse by law enforcement personnel in the form of fabricated investigations and risks the

> evisceration of the Sixth Amendment right recognized in *Massiah* ... Consequently, *incriminating statements pertaining to pending charges are inadmissible at the trial of those charges, notwithstanding the fact that the police were also investigating other crimes, if, in obtaining this evidence, the State violated the Sixth Amendment by knowingly circumventing the accused's right to the assistance of counsel.*

*Moulton,* 474 U.S. at 179–80, 106 S.Ct. 477 (emphasis added).

The critical question, then, is whether the Government, in using Garcia as an investigative agent, "knowingly circumvent[ed]" Jacques's right to the assistance of counsel with respect to the kidnapping charge. *Id.* In *Massiah,* the Supreme Court held that the defendant's Sixth Amendment right to counsel was violated where "there was used against him at his trial evidence of his own incriminating words, which federal agents had *deliberately elicited* from him after he had been indicted and in the absence of his counsel." 377 U.S. at 206, 84 S.Ct. 1199 (emphasis added). The Court did not explicitly define what constitutes "deliberate elicitation" of incriminating statements, but found that it existed where a co-defendant who was cooperating with the government permitted investigators to install a radio transmitter in his car and then had a "lengthy conversation" with the defendant while parked in a location where he knew the investigators would be able to monitor

---

**4.** In *Texas v. Cobb,* 532 U.S. 162, 121 S.Ct. 1335, 149 L.Ed.2d 321 (2001), the Supreme Court held that whether two offenses are the same for Sixth Amendment purposes depends on the double-jeopardy test articulated in *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932). *Blockburger* holds that "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be ap-

plied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Id.* at 304, 52 S.Ct. 180. Here, there is no question that obstruction of justice and the underlying kidnapping are separate offenses for Sixth Amendment purposes, since each offense requires proof of a fact which the other does not.

the transmitter. *Id.* at 203, 84 S.Ct. 1199. In two subsequent cases in which the Court found that the right to counsel had been violated, *Henry* and *Moulton,* the Court provided further guidance on when the use of an informant constitutes "deliberate elicitation" of incriminating statements.

In *Henry,* the Government utilized a jailhouse informant to obtain incriminating statements from the defendant in a bank robbery case. The informant was instructed not to ask any questions about or otherwise initiate conversation regarding the bank robbery, but was told to pay attention to any statements that the defendant made about the robbery. In finding that such use of the informant constituted deliberate elicitation of incriminating statements, the Court indicated that "[t]hree factors [were] important[:]" 1) that the informant "was acting under instructions as a paid informant for the Government[;]" 2) that the informant "was ostensibly no more than a fellow inmate of Henry[;]"[5] and 3) that "Henry was in custody and under indictment at the time he was engaged in conversation by [the informant]."[6] 447 U.S. at 270, 100 S.Ct. 2183. The Court stated that "[e]ven if the agent's statement that he did not intend that [the informant] would take affirmative steps to secure incriminating information is accepted, he must have known that such propinquity likely would lead to that result." *Id.* at 271, 100 S.Ct. 2183.[7] Based on the circumstances of the case, the Court concluded that the statements obtained by the agent were inadmissible at the bank robbery trial because the Government had "intentionally creat[ed] a situation likely to induce Henry to make incriminating statements without the assistance of counsel[.]" *Id.* at 274, 100 S.Ct. 2183. Notably, the Court suggested that a defendant would be even more likely to make incriminating statements to an informant "where the informant and the accused had a prior longstanding relationship." *Id.* at 274 n. 12, 100 S.Ct. 2183.

*Moulton* involved two co-defendants, Moulton and Colson, who were charged with receiving stolen goods. Colson went to the police and offered to cooperate after Moulton suggested the possibility of killing a State's witness. Colson allowed the police to record his telephone calls with Moulton and to record a meeting, arranged by Moulton, at which the two were to plan their defense in the underlying case. The police instructed Colson "not to attempt to question [ ] Moulton, just to be himself in his conversation," 474 U.S. at 165, 106 S.Ct. 477, but the recordings revealed that "Colson frequently pressed Moulton for details of various thefts." *Id.* at 177 n. 13, 106 S.Ct. 477. The Court found that incriminating statements made during the recorded meeting were not admissible at Moulton's trial for the crime of receiving stolen goods because the State had obtained them "by knowingly circumventing the accused's right to have counsel present

---

**5.** The Court recognized that a defendant would be more likely to make incriminating statements to someone whom he did not realize was acting as an agent of law enforcement. *Henry,* 447 U.S. at 273, 100 S.Ct. 2183.

**6.** The Court indicated that "the fact of custody bears on whether the Government 'deliberately elicited' the incriminating statements" because "confinement may bring into play

subtle influences that will make [the accused] particularly susceptible to the ploys of undercover Government agents." *Henry,* 447 U.S. at 273–74 n. 11, 100 S.Ct. 2183.

**7.** The Court noted that "[i]n *Massiah,* no inquiry was made as to whether Massiah or his codefendant first raised the subject of the crime under investigation." *Henry,* 447 U.S. at 271–72, 100 S.Ct. 2183.

in a confrontation between the accused and a state agent." *Id.* at 176, 106 S.Ct. 477. The Court stated that while "[d]irect proof of the State's knowledge will seldom be available[,]" evidence establishing that "the State 'must have known' that its agent was likely to obtain incriminating statements ... suffices to establish a Sixth Amendment violation." *Id.* at 176 n. 12, 106 S.Ct. 477 (quoting *Henry*, 447 U.S. at 271, 100 S.Ct. 2183). The Court noted that, because "the identity of the party who instigated the meeting at which the Government obtained incriminating statements was not decisive or even important to our decisions in *Massiah* or *Henry*," the fact that Moulton had arranged the meeting in question did not affect its conclusion that his Sixth Amendment right to counsel had been violated.

Based on the Supreme Court's discussions in *Massiah, Henry,* and *Moulton,* the circumstances surrounding the Government's use of Garcia in the instant case indicate that the Government knowingly circumvented Jacques's right to the assistance of counsel with respect to the kidnapping charge. Although the Government highlights the fact that it was Jacques who initiated contact with Garcia and represents that Garcia, after contacting the Government, merely "passively receive[d] the communications pressed upon him by the desperate and determined Jacques," Opp'n to Mot. to Suppress 11,[8] it is clear that the government "must have known that [Garcia] was likely to obtain incriminating statements" about the kidnapping. *Moulton,* 474 U.S. at 176 n. 12, 106 S.Ct. 477 (internal quotation omitted).

The fact that Garcia had a "prior long-standing relationship" with the defendant and that the defendant was in custody at the time of the communications suggest that it was foreseeable that Jacques would confide in Garcia. *See Henry,* 447 U.S. at 274, 100 S.Ct. 2183. Furthermore, the fact that Garcia was being used to investigate a potential obstruction of justice charge relating to Jacques's attempt to cover up his involvement in the underlying kidnapping offense suggests that the Government "must have known that [Garcia] was likely to obtain incriminating statements" about the kidnapping. *Moulton,* 474 U.S. at 176 n. 12, 106 S.Ct. 477. In fact, the Government conceded as much at the suppression hearing. In answering a question regarding whether Department of Justice policy instructs the members of a taint team to excise from the information they share with a prosecution team all information which relates to the underlying offense, AUSA Darrow stated:

> [I]n a case like this involving a post-arrest obstruction offense, that rule would be very difficult because any obstruction offense I think by its nature, or most obstruction offenses by their nature include components or at least references to the underlying offense and prosecution, which is the aim of the new offense to obstruct. So ... it would be hard to treat them as completely separate.... [I]t would be difficult to excise out everything related to the charged offense in an obstruction investigation just because it would be hard to make sense of it.

8. The Government has not explicitly argued in its briefing that Jacques waived his Sixth Amendment right to counsel by actively "pressing" his communications upon Garcia. Any such argument would be foreclosed by *Henry:* "[T]he concept of a knowing and voluntary waiver of Sixth Amendment rights does not apply in the context of communications with an undisclosed undercover informant acting for the Government." 447 U.S. at 273, 100 S.Ct. 2183.

Suppression Hr'g Tr. 10–11.[9] The understanding that using Garcia to investigate the obstruction offense would likely lead to the elicitation of statements by Jacques pertaining to the underlying kidnapping was shared by Agent Alford, one of the FBI agents responsible for handling Garcia. When asked if he "expect[ed] that [Garcia's] assistance would lead to evidence which [might] incriminate Mr. Jacques in regard to the death of Miss Bennett," Agent Alford responded, "Yes, quite possibly." *Id.* at 155. Consistent with Agent Alford's testimony, in a previous motion filed with the Court, the Government stated that "Garcia was told not to talk about the murder case but all involved knew that some information might well come out." Mot. to Release Redacted Transcripts 4, ECF No. 88. In fact, during the recorded conversations, there were several instances in which Garcia actively asked questions pertaining to the charged conduct. *See* n. 2 *supra.*

The Government, after reviewing the statements actually collected by Garcia, again reinforced its understanding that its investigation of the post-arrest obstruction of justice and its investigation of the underlying kidnapping offense were inextricably linked. *See* Opp'n to Mot. to Suppress 17. In setting forth the ways in which the obstruction evidence could become relevant at the penalty phase of this proceeding, the Government asserted that "[t]he obstruction evidence would [ ] be probative in the event the defense raises residual doubt [as to the defendant's guilt of the underlying offense], as it establishes

with certainty that Jacques murdered Brooke and put her body in the grave." *Id.* The fact that Garcia obtained from Jacques statements that the Government now argues are relevant to proving Jacques's guilt of the underlying offense lends further support to Jacques's assertion that the Government "intentionally creat[ed] a situation likely to induce [him] to make incriminating statements [regarding the kidnapping charge] without the assistance of counsel[.]" *Henry,* 447 U.S. at 274, 100 S.Ct. 2183.

Although the Government argues that the Supreme Court's decision in *Kuhlmann v. Wilson,* 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986), requires this Court to find that it did not use Garcia to deliberately elicit incriminating statements from Jacques, this argument is unpersuasive. In *Kuhlmann,* the Court held that the Sixth Amendment does not forbid "admission in evidence of an accused's statements to a jailhouse informant who was 'placed in close proximity but [made] no effort to stimulate conversations about the crime charged.'" *Id.* at 456, 106 S.Ct. 2616 (quoting *Henry,* 447 U.S. at 271 n. 9, 100 S.Ct. 2183). Importantly, in *Kuhlmann,* the jailhouse informant was a stranger to the defendant who was placed in the same cell and specifically instructed by the government not to ask questions, but simply to "keep his ears open." *Id.* at 439, 106 S.Ct. 2616. The *Kuhlmann* Court explicitly noted two factors that distinguished the informant in that case from the informants used in *Henry* and *Moulton.* First,

---

9. Notably, the publicly available DOJ manuals that refer to the use of taint teams make reference to these teams as a device for addressing potential violations of the attorney-client privilege. *See* Dept. of Justice, United States Attorneys' Manual § 9–13.420(c)(1997), online at http://www.justice.gov/usao/eousa/foia_reading_room/usam/title 9/13mcrm.htm# 9–13.420 (as visited April 29,

2011); Dept. of Justice, Searching and Seizing Computers and Obtaining Evidence in Criminal Investigations, Chapter 2 § F(2)(b) (2009), online at http://www.justice.gov/criminal/cybercrime/ssmanual/ssmanual2009.pdf (as visited on April 29, 2011). The Court has been unable to locate any publicly available DOJ policy that discusses the use of taint teams to avoid *Massiah* problems.

the informant in *Kuhlmann* was previously unknown to the defendant and "had [not] developed a relationship of trust and confidence with the defendant[.]" *Id.* at 458, 106 S.Ct. 2616 (quoting *Henry*, 447 U.S. at 269, 100 S.Ct. 2183). Second, unlike Henry and Moulton, Kuhlmann did not "demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." *Id.* at 459, 106 S.Ct. 2616.

In the instant case, it is clear that the Government's informant is akin to the informants used in *Henry* and *Moulton*, and unlike the informant used in *Kuhlmann*, in both these respects. Garcia was not only a close friend of Jacques,[10] he was someone Jacques explicitly sought out to help him implement a clandestine plan to fabricate exculpatory evidence. Moreover, rather than having Garcia serve as a passive "listening post," *id.* at 456 n. 19, 106 S.Ct. 2616 (quoting *Moulton*, 474 U.S. at 177 n. 13, 106 S.Ct. 477), the Government took deliberate steps designed to elicit incriminating remarks from Jacques by facilitating Garcia's access to the purportedly confidential attorney phone line and visiting facilities and by having Garcia represent to Jacques that he was willing to assist with the plan to obstruct the kidnapping investigation.[11]

■ In light of the circumstances surrounding the phone calls and visits, which Jacques believed were conducted in confidence for the purpose of facilitating his scheme to interfere with the investigation into the kidnapping and murder of Miss Bennett, it is clear the Government "intentionally creat[ed] a situation likely to induce [Jacques] to make incriminating statements [regarding the kidnapping and murder] without the assistance of counsel[.]" *Henry*, 447 U.S. at 274, 100 S.Ct. 2183. Because the Government " 'must have known' that its agent was likely to obtain incriminating statements from the accused" regarding the underlying offense, Jacques has established that use of these statements at his trial on the kidnapping charge would violate the Sixth Amendment. *Moulton*, 474 U.S. at 176 n. 12, 106 S.Ct. 477. Accordingly all statements obtained by Garcia once he began acting as an agent of the Government on July 16, 2008 must be suppressed at the trial.

■ Nevertheless, as the Government has noted, the Sixth Amendment right to counsel is "offense specific." *McNeil v. Wisconsin*, 501 U.S. at 175, 111 S.Ct. 2204. Accordingly, if the Government elects to bring a separate prosecution against Jacques for obstruction of justice, it will certainly be free to introduce Jacques's statements to Garcia in proceedings on that charge since it is undisputed that his right to counsel with regard to the obstruction charge had not attached at the time the statements were made. *See Moulton*, 474 U.S. at 180 n. 16, 106 S.Ct. 477 ("Incriminating statements pertaining to other crimes, as to which the Sixth Amendment right has not yet attached,

---

**10.** The close nature of Garcia and Jacques' pre-existing relationship is evident from the transcripts of the recorded conversations, which often conclude with two men saying they "love" each other. *See* ECF No. 226–2 at 8; ECF No. 226–5 at 40; ECF No. 226–9 at 34.

**11.** The transcripts of the phone calls and visits reveal that, when presented with various parts of the plan, Garcia acted as though he understood them and was willing to attempt to implement them. During his visits to the jail, Garcia even told Jacques that he had tried to call J1, as Jacques had asked, but that she had not answered her phone. See n. 2 *supra.* Garcia did not tell Jacques he was unwilling to participate in the plan until August 1, during their last phone conversation.

are, of course, admissible at a trial of those offenses."). A constitutional violation would only occur if Jacques's statements pertaining to the underlying kidnapping offense were introduced in the instant case.

*Admissibility of the Statements During Penalty Phase*

Without conceding the inadmissibility of the statements obtained by Garcia at the guilt phase of the trial, the Government has indicated that it hopes to "avoid the thorny *Massiah* issue and streamline resolution of the contested evidence," by limiting its use of the statements to the penalty phase of this capital case to help prove non-statutory aggravating factors and, if necessary, to rebut "residual doubt" [12] as to Jacques's guilt of the underlying offense. Opp'n to Mot. to Suppress 16–17; Second Supp. Mem. in Opp'n to Mot. to Suppress 22, ECF No. 265.

In support of its argument that *Massiah* evidence, inadmissible during the guilt phase of a capital trial, may still be admitted at the penalty phase, the Government relies upon the general principle that "in order to achieve [ ] 'heightened reliability,' more evidence, not less, should be admitted on the presence or absence of aggravating and mitigating factors[.]" *Fell,* 360 F.3d at 143 (citing *Gregg,* 428 U.S. at 203–04, 96 S.Ct. 2909); *see also Williams,* 337 U.S. at 247, 69 S.Ct. 1079 ("[M]odern concepts individualizing punishment have made it all the more necessary that a sentencing judge not be denied an opportunity to obtain pertinent information by a requirement of rigid adherence to restric-tive rules of evidence properly applicable to the trial.").

The Government points out that, in the non-capital context, evidence that is inadmissible at trial on constitutional grounds is often admissible at sentencing proceedings. *See, e.g., United States v. Tejada,* 956 F.2d 1256, 1263 (2d Cir.1992) ("Absent a showing that officers obtained evidence expressly to enhance a sentence, a district judge may not refuse to consider relevant evidence at sentencing, even if that evidence has been seized in violation of the Fourth Amendment."); *United States v. Nichols,* 438 F.3d 437, 442 (4th Cir.2006) ("statements obtained in violation of *Miranda,* if they are otherwise voluntary, may generally be considered at sentencing"); *United States v. Bender,* 221 F.3d 265, 271 (1st Cir.2000) (Massiah material inadmissible at trial may still be used at non-capital sentencing proceeding pursuant to U.S.S.G. § 3C1.1). Furthermore, the Government notes that in *United States v. Fields,* the Fifth Circuit held that the Sixth Amendment confrontation clause does not bar the admission of testimonial hearsay used to prove non-statutory aggravating factors at the penalty phase of a capital case brought under the FDPA. 483 F.3d 313, 325–26.

While the Government does not assert that these cases explicitly answer the question of whether the Sixth Amendment right to counsel bars the admission of *Massiah* evidence at the penalty phase of an FDPA case, it argues that these cases evince a general principle that "constitutional rights traditionally have been more circumscribed at sentencing, even capital sentencing, than during the guilt phase."

---

**12.** The Government explains residual doubt as follows: " 'Residual doubt' refers to lingering doubts in the minds of penalty phase capital jurors, who during the guilt phase were convinced of a defendant's guilt beyond a *reasonable* doubt. Such jurors, not absolutely certain of guilt, in the penalty phase may be troubled by 'residual' doubt." Opp'n to Mot. to Suppress 11.

*Fields*, 483 F.3d at 326 (citing *Williams v. People of State of N.Y.*, 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949)). The Government argues that, in light of the willingness of courts to relax constitutional restrictions on evidence at sentencing proceedings, and in light of the desirability of more, not less evidence at these proceedings, the Court should admit the statements obtained by Garcia in the event this case reaches the penalty phase.

Jacques argues that the Supreme Court's opinion in *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), establishes that evidence obtained in violation of the Sixth Amendment right to counsel may not be introduced during the penalty phase of a capital case. *Estelle* involved the testimony of a psychiatrist who examined the defendant shortly after his arrest without providing notice to defense counsel and without providing a *Miranda* warning. While the purpose of the evaluation had been to determine the defendant's competency, the prosecution called the psychiatrist during the penalty phase, in its rebuttal case, to testify regarding the defendant's future dangerousness. The Supreme Court held that admission of this evidence during the penalty phase violated both the Fifth Amendment privilege against self-incrimination and the Sixth Amendment right to counsel. *Id.* at 472 ("[T]he death penalty was improperly imposed ... because the psychiatric examination on which Dr. Grigson testified at the penalty phase proceeded in violation of

respondent's Sixth Amendment right to the assistance of counsel.").[13]

The Government attempts to distinguish the instant case from *Estelle* on four grounds: 1) Jacques's statements to Garcia were not compelled; 2) whereas the psychiatrist in *Estelle* was a surprise witness, Jacques's counsel now has notice of the evidence that the Government seeks to introduce; 3) whereas a psychiatric exam is a matter on which a defendant has a legitimate interest in consulting with counsel, Jacques "had a weak interest at best in consulting with counsel regarding his scheme to obstruct justice[;]" and 4) whereas the testimony of one doctor "when benefiting from the absence of opposing counsel and vigorous cross examination ... suffers from reliability problems," the evidence at issue in the instant case is "specific, reliable, and accurate[.]" Opp'n to Mot. to Suppress 27–28. As explained below, none of these distinctions are germane to the underlying premise in *Estelle* that the introduction at the penalty phase of a capital case of statements obtained from a defendant acting without the assistance of counsel, after the right to counsel has attached, violates the Sixth Amendment.

Although the issue of whether the defendant's statements were compelled was of course relevant to the *Estelle* Court's Fifth Amendment analysis, this issue was not relevant to the Sixth Amendment holding. And while the issue of the psychiatrist being a surprise witness, not included on the Government's witness list, was dis-

---

13. Notably, in its discussion of Smith's Fifth Amendment claim, the Court commented: "We can discern no basis to distinguish between the guilt and penalty phases of respondent's capital murder trial so far as the protection of the Fifth Amendment privilege is concerned. Given the gravity of the decision to be made at the penalty phase, the State is not relieved of the obligation to observe fun-

damental constitutional guarantees." *Estelle*, 451 U.S. at 462–63, 101 S.Ct. 1866 (citing *Green v. Georgia*, 442 U.S. 95, 97, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979); *Presnell v. Georgia*, 439 U.S. 14, 16, 99 S.Ct. 235, 58 L.Ed.2d 207 (1978); *Gardner v. Florida*, 430 U.S. 349, 357–358, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977) (plurality op.)).

cussed in the context of a due process claim raised by the defendant, the Court made clear that for purposes of the Sixth Amendment claim, the relevant fact with regard to notice was whether counsel was made aware of the psychiatric interview *before* the interview occurred. 451 U.S. at 469, 101 S.Ct. 1866 ("The Court of appeals concluded that [the defendant] had a Sixth Amendment right to the assistance of counsel *before submitting to the pretrial psychiatric interview.* We agree." (emphasis added) (citation omitted)). The Court never suggested that the Sixth Amendment problem could be remedied by notifying counsel of the interview after it had taken place.

■ Furthermore, the Government's suggestion that the legitimacy of a represented defendant's constitutional interest in the assistance of counsel before deciding whether or not to speak with a government agent somehow depends on whether the agent is a psychiatrist or a confidential informant lacks any support either in *Estelle* or in any other decision cited by the Government. In arguing that a defendant's right to the assistance of counsel somehow dissipates where uncounseled statements obtained from the defendant are arguably "reliable" or pertain to illicit activity, the Government misapprehends the breadth of the interests protected by the Sixth Amendment. "Of all the rights that an accused person has, the right to be represented by counsel is by far the most pervasive, for it affects his ability to assert any other rights he may have." 488 U.S.

75, 84, 109 S.Ct. 346, 102 L.Ed.2d 300 (1988) (citation and quotation omitted); *see also United States v. Cronic,* 466 U.S. 648, 658, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984) ("The presumption that counsel's assistance is essential requires us to conclude that a trial is unfair if the accused is denied counsel at a critical stage [14] of his trial."). Accordingly, it would be well beyond the province of this Court to carve out exceptions to a charged defendant's right to consult with counsel based upon its own assessment of the reliability of statements obtained in circumvention of this right.

Another distinction between *Estelle* and the instant case, and arguably a more meaningful one than those emphasized in the Government's briefing, involves the specific purposes for which the Government seeks to introduce the statements in question at the penalty phase. In *Estelle* the state introduced the testimony of the psychiatrist to help prove future dangerousness. Under the Texas scheme in place at that time, future dangerousness was one of three questions on which the state bore the burden of proof beyond a reasonable doubt at the penalty phase.[15] If the jury answered all three questions in the affirmative, the judge was required to impose the death penalty. *See Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976) (upholding the constitutionality of the Texas scheme). While neither *Jurek* nor *Estelle,* both of which were decided well before *Ring,* referred to future dangerousness as an "element" of

---

**14.** *Massiah* and its progeny make clear that "post-indictment communications between the accused and agents of the Government" constitute a "critical stage" for Sixth Amendment purposes. *See Henry,* 447 U.S. at 270, 100 S.Ct. 2183.

**15.** The other two questions were "whether the conduct of the defendant that caused the death of the deceased was committed deliber-

ately and with the reasonable expectation that the death of the deceased or another would result" and "if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased." Tex. Code Crim. Proc. Ann., Arts. 37.071(b)(1) and (3) (Vernon Supp. 1980).

the crime of capital murder, *Ring* makes clear that, under the Texas scheme, future dangerousness was in fact the "functional equivalent of an element" because a finding of future dangerousness was necessary to impose the death penalty. *Ring*, 536 U.S. at 608, 122 S.Ct. 2428. By contrast, the Government has represented that it only intends to introduce the statements at issue in the instant case to prove non-statutory aggravating factors and, if necessary, to rebut residual doubt as to Jacques's guilt of the underlying offense. As explained in the discussion of Jacques's motion to strike the notice of intent to seek the death penalty, the Court is not convinced that non-statutory aggravating factors are the functional equivalent of elements under the FDPA scheme because they are only considered once the jury has determined that the defendant is eligible for the death penalty by virtue of the gateway intent factors and the statutory aggravating factors.

Setting the issue of residual doubt aside for a moment, this scenario raises a novel question as to whether the premise, announced in *Estelle*, that the Sixth Amendment bars the admission of uncounseled statements obtained after the right to counsel has attached at the penalty phase of a capital proceeding lacks force where the Government seeks to use the statements to prove non-statutory aggravating factors but not statutory aggravating factors. For a number of reasons, the Court concludes that admission of *Massiah* material in this particular context would be inconsistent with the procedural safeguards created by the FDPA and with the underlying purposes of the Sixth Amendment.

To begin with, the subsection of the FDPA that describes "[p]roof of mitigating and aggravating factors" that may be introduced at the penalty phase makes no distinction between statutory and non-statutory aggravating factors. 18 U.S.C. § 3593(c). The subsection does not refer to statutory and non-statutory factors separately, rather it simply refers to "aggravating factors" as a single category and states that "[t]he government may present any information relevant to an aggravating factor for which notice has been provided under subsection (a)." *Id.* While the subsection indicates that "[i]nformation is admissible regardless of its admissibility under the rules governing admission of evidence at criminal trials[,]" *id.*, the statute does not purport to waive constitutional restrictions on the admissibility of evidence at the penalty phase, nor could it. Finally, the subsection states that "[t]he burden of establishing the existence of any aggravating factor is on the government, and is not satisfied unless the existence of such a factor is established beyond a reasonable doubt." *Id.* (emphasis added). In light of the statute's uniform treatment of statutory and non-statutory aggravating factors with regard to rules of proof, the Court finds no basis in the FDPA for allowing the Government, in its effort to prove non-statutory aggravating factors, to introduce evidence that is inadmissible on constitutional grounds to prove statutory aggravating factors.

Moreover, even if the Court were to conclude that there were some principled basis for allowing *Massiah* evidence in to prove non-statutory aggravating factors, even though it is inadmissible to prove statutory aggravating factors, such a result would be nearly impracticable. As explained in the discussion of the motion to strike the notice of intent to seek the death penalty, a single piece of evidence introduced at the penalty phase may very well be relevant to proving more than one ag-

gravating factor, and this is permissible.[16] Indeed, it is not difficult to imagine a situation where a single statement by the defendant would be relevant both to a non-statutory aggravating factor and to a statutory aggravating factor. In the instant case, for example, the Government could plausibly argue that specific details of Jacques's alleged plan to obstruct justice, which involved the use of email accounts he had surreptitiously created before the kidnapping and murder, are relevant to the statutory aggravating factor of "substantial planning and premeditation" as well as the non-statutory aggravating factor of "lack of remorse," both of which are included in the notice of intent. If the *Massiah* material were admitted, the Court would be required to instruct the jurors that they could consider it for the limited purpose of determining whether the Government had proved the non-statutory aggravating factors but that they could not consider it with regard to the statutory aggravating factors. Such an instruction would be difficult to draft comprehensibly and, more importantly, nearly impossible for the jury to follow. While limiting instructions on permissible and impermissible uses of specific pieces of evidence are not uncommon, the Court is apprehensive, to say the least, about relying upon such instructions to safeguard a constitutional right as fundamental as the right to counsel at the penalty phase of a capital case.

Finally, the Government's candid suggestion that it might also seek to use the *Massiah* statements to rebut residual doubt as to Jacques's guilt of the underlying offenses gives further reason to doubt the wisdom of admitting these statements at the penalty phase. *Massiah* and its progeny make clear that if the Sixth Amendment right to counsel protects anything, it is the interest of a defendant to have access to the advice of counsel when the Government seeks to elicit from him statements that will be used to prove guilt of the offense for which his right to counsel has attached. *Massiah,* 377 U.S. 201, 84 S.Ct. 1199; *Henry,* 447 U.S. 264, 100 S.Ct. 2183; *Moulton,* 474 U.S. 159, 106 S.Ct. 477. The Government fails to identify any convincing argument that the fundamental constitutional problem is somehow averted if it seeks to introduce *Massiah* evidence for the purpose of proving the defendant's guilt of the underlying offense at the penalty phase rather than at the guilt phase. "Given the gravity of the decision to be made at the penalty phase, the State is not relieved of the obligation to observe fundamental constitutional guarantees." *Estelle,* 451 U.S. at 462–63, 101 S.Ct. 1866 (citing *Green v. Georgia,* 442 U.S. 95, 97, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979); *Presnell v. Georgia,* 439 U.S. 14, 16, 99 S.Ct. 235, 58 L.Ed.2d 207 (1978); *Gardner v. Florida,* 430 U.S. 349, 357–358, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977) (plurality op.)).

■ The Government argues that, even if the Court rules that the *Massiah* evidence cannot be introduced at the sentencing hearing, " 'sanitized' versions of the post-July 15 obstruction evidence, scrubbed to remove references to the murder, should be admissible." Reply to Post–Hr'g Mem. in Support of Mot. to Suppress 13–14 n.3, ECF No. 269. The Court does have some questions as to

---

**16.** Aggravating factors are only impermissibly duplicative "when one 'necessarily subsumes' the other or, in other words, when a jury would 'necessarily have to find one in order to find the other[.]' " *Fell II,* 531 F.3d at 235– 36 (citations omitted). "Two factors are not duplicative merely because they are supported by the same evidence." *Id.* (citation omitted).

whether scrubbing the evidence of references to the charged conduct is a practicable solution in light of AUSA Darrow's comments that doing so would be "very difficult" because of the interrelatedness of the charged conduct and the alleged attempt by Jacques to obstruct the investigation of this conduct. *See supra.* Nevertheless, the Government should be given the opportunity to attempt to sanitize the statements in question. The Court will review the scrubbed statements before ruling on their admissibility at the penalty phase to make sure that they are admissible pursuant to 18 U.S.C. § 3593(c).

For all of the foregoing reasons the Court **grants in part** and **denies in part** the motion to suppress the statements obtained by Garcia after July 15, 2008. To the extent they make reference to the charged criminal conduct, the statements will be excluded from the guilt phase and, if the trial proceeds to the penalty phase, from that proceeding as well.