11-2142-cr
United States v. Jacques

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2011

(Argued: May 31, 2012                    Decided: July 9, 2012)

Docket No.  11-2142-cr

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

UNITED STATES OF AMERICA,
          Appellant,

          v.

MICHAEL JACQUES,
          Defendant-Appellee.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

B e f o r e:   WINTER, CHIN, and DRONEY, Circuit Judges.

Interlocutory appeal from pre-trial orders of the United States District Court for the District of Vermont (William K. Sessions, III, Judge) excluding evidence that the government sought to offer in the punishment phase of a capital case.  We affirm in part and vacate in part.

WILLIAM B. DARROW, Assistant United States Attorney (Craig S. Nolan, Paul J. Van De Graaf, and Gregory L. Waples, Assistant United States Attorneys, on the brief,) for Tristram J. Coffin, United States Attorney for the District of Vermont, Burlington, Vermont, for Appellant.

DAVID A. RUHNKE (Jean D. Barrett, Ruhnke & Barrett, Montclair, New Jersey, and Michael L. Desautels and Barclay T. Johnson, Office of the Federal Public Defender, Burlington, Vermont, on the brief), Ruhnke & Barrett, Montclair, New Jersey, for Defendant-Appellee.

WINTER, Circuit Judge:

The government appeals from Judge Sessions's in limine ruling excluding certain evidence from the penalty phase of a death penalty case. After obtaining an indictment against Michael Jacques for the kidnapping, rape, and murder of a 12-year-old girl, the government filed a Notice of Intent to Seek the Death Penalty ("Notice"). Included in the Notice, as required by the Federal Death Penalty Act, 18 U.S.C. § 3591, et seq., were allegations of aggravating factors the government proposed to put before the jury in the penalty phase that would follow a conviction. These factors included allegations of six prior rapes and an attempt to obstruct justice by influencing the testimony of a juvenile witness/victim.

In pre-trial orders, Judge Sessions struck allegations of three of the prior rapes from the Notice under 18 U.S.C. § 3593(c) and suppressed evidence of the attempt to obstruct justice as having been obtained in violation of the Sixth Amendment. The government appealed.

We affirm the exclusion of evidence of two of the alleged prior rapes, remand the third for reconsideration but leave the

2

outcome to the district court's discretion, and vacate the exclusion of evidence of the attempted obstruction of justice. We address each issue in turn.

a) <u>Prior Rapes</u>

   1) Relevant Facts

In the Notice, the government alleged several prior rapes by Jacques. The alleged victims included four juveniles and two adults, whom we refer to as J1-J4 and A1-A2, respectively. The district court ruled that evidence of the rape of J1 was admissible during the penalty phase. Briefly stated here, and more fully discussed <u>infra</u>, defendant's sexual contacts with J1 occurred over several years and were in part contemporaneous with the kidnapping/rape/murder in the present matter which is alleged to have occurred in 2008. Moreover, defendant is alleged to have used J1 to lure the murdered 12-year old to her encounter with Jacques.

The court also allowed the admission of evidence of the rape of A2 in the penalty phase. This crime occurred in 1992 and resulted in a kidnapping and rape conviction. A1 has died, and the government no longer seeks to introduce evidence with regard to her.

The court excluded evidence concerning J2, J3, and J4, and the government has appealed. We turn now to these rulings.

In January 1985, J2, a younger relative of Jacques, sought an abortion, which came to the attention of law enforcement

3

authorities. J2 told the Vermont State Police that she was pregnant as a result of being raped by Jacques, who was then 18. Jacques admitted that he had "experimented" with J2 and was arraigned on various charges; however, the case was dismissed after the family decided not to pursue the case.

Jacques is accused of raping J3 around the same time. She was a young girl who spent the night at Jacques's residence with a younger sibling. J3 never reported this incident to the police because she feared that they would not believe her.

Finally, Jacques is alleged in 1987 to have raped J4, another young girl, who was a friend of one of Jacques's younger siblings. The rape is alleged to have occurred after Jacques provided alcohol to her at his apartment. J4's school nurse learned of the rape and called the police. Following an investigation, Jacques was arrested and charged. After pleading guilty to lewd and lascivious conduct, he was given a three-year deferred sentence.

The district court struck the allegations concerning J2, J3, and J4 from the Notice, concluding that, because the conduct alleged was unadjudicated and over twenty years old, their probative value was outweighed by their potential prejudice.

2) Discussion

Evidentiary rulings under 18 U.S.C. § 3593© are reviewed only for abuse of discretion. See United States v. Fell, 531 F.3d 197, 209 (2d Cir. 2008).

4

The government argues that the exclusion of these allegations will deprive the jury of a full picture of Jacques's personal characteristics and his past conduct as a serial rapist. The government also argues that the district court based its ruling with regard to the allegations concerning J4 on an erroneous finding of fact because those allegations were in fact adjudicated. Section 3593© provides that in the penalty phase of a capital case, "[i]nformation is admissible regardless of its admissibility under the rules governing admission of evidence at criminal trials except that information may be excluded if its probative value is outweighed by the danger of . . . creating unfair prejudice, confusing the issues, [or] misleading the jury." The standard for exclusion of evidence under this Section is broader than under Fed. R. Evid. 403, which allows the exclusion of relevant evidence "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury." (emphasis added).

Generally, "*more* evidence, not less, should be admitted on the presence or absence of aggravating and mitigating factors" in the penalty phase of a capital case. Fell, 531 F.3d at 219 n.12 (emphasis in original) (quoting United States v. Fell, 360 F.3d 135, 143 (2d Cir. 2004)). Nevertheless, district courts "retain the discretion to exclude any type of unreliable or prejudicial evidence." United States v. Pepin, 514 F.3d 193, 204 (2d Cir. 2008)(quoting Fell 360 F.3d at 145).

Defendant's alleged conduct toward J2, J3, and J4 is alleged to have occurred almost, or over, twenty-five years ago. Such remoteness reduces the reliability of testimony as to the events' occurrences. In the case of J2 and J3, the danger of unreliability is somewhat enhanced by the lack of a relatively contemporaneous adjudication. In the case of J4, there was an adjudication, but the resultant judgment was not for rape. There is, moreover, murkiness as to each with regard to whether, or how much, coercion was involved. Finally, the remoteness of the allegations also reduces their probative value with regard to Jacques's character because he was a youth himself at the time. Cf. Fed. R. Evid. 609(b) (suggesting that the probative weight of prior crimes used to impeach character is less reliable once significant time has passed); United States v. Figueroa, 618 F.2d 934, 942 (2d Cir. 1980) ("[B]oth Rule 609 and Rule 403, which is pertinent here, oblige the trial court to assess the probative value of every prior conviction offered in evidence and the remoteness of a conviction, whatever its age, is always pertinent to this assessment.").

Therefore, although we might well have ruled otherwise were we in the district court's position, we conclude that the court acted within its considerable discretion to rule that the lack of reliability of the allegations with regard to J2, J3, and J4

6

outweighed their probative values.[1]  However, the district court based its order concerning J4 in part on the assumption that those allegations were unadjudicated.  In fact, Jacques pleaded guilty to lewd and lascivious conduct in connection with his conduct with J4.  We vacate the order with regard to the allegations regarding her and remand for the district court to reconsider its ruling in light of that adjudication.  We add, however, that the district court would still be within its discretion to conclude that the age of these allegations and the ambiguity of the plea as to rape is sufficient to warrant their exclusion under § 3593©.

b)  <u>Obstruction of Justice</u>

   1) Relevant Facts

   Because the obstruction of justice relates to evidence of the underlying offense, we briefly set out pertinent allegations with regard to those charges.

   The government alleges that in 2003 Jacques concocted a scheme to sexually abuse the then nine-year-old J1.  This scheme involved making J1 believe that a fictitious organization named "Breckenridge" would kill her and her family if she did not

---

   [1] We note that the district court is free to alter these rulings, if appropriate, as the case progresses.  <u>See</u> <u>Palmieri v. Defaria</u>, 88 F.3d 136, 139 (2d Cir. 1996) (A ruling <u>in limine</u> "is subject to change when the case unfolds." (quoting <u>Luce v. United States</u>, 469 U.S. 38, 41-42 (1984))).  Such a change may be in the court's discretion if these allegations become necessary to rebut evidence offered by the defense concerning Jacques's past.  <u>See, e.g.</u>, <u>Luce</u>, 469 U.S. at 41-42 (change of <u>in limine</u> ruling may be appropriate where defendant introduces testimony contrary to statements given in a proffer).

7

follow the group's instructions. Jacques allegedly sent e-mail messages from two accounts seemingly owned by members of Breckenridge named "Charles" and "Eric." The e-mails told J1 that Jacques was to act as her "sexual trainer" and advised her to engage in various sex acts with Jacques. When J1 protested, she received e-mail threats that included the killing of family pets. Jacques's exploitation of J1 through "Breckenridge" continued until 2008, when J1 was 14 years old.

In May 2008, J1 received messages from Breckenridge that a 12-year-old named Brooke needed to be terminated and that J1 was to help in the termination by inviting Brooke to a party. On the morning of the party in late June 2008, Jacques and J1 picked Brooke up and drove to a convenience store about ten minutes from Jacques's home. Once there, Jacques dropped Brooke off in front of the store's surveillance camera but told her to walk to a nearby spot where they would pick her up. Jacques and J1 then allegedly left but circled back to pick Brooke up. The government alleges that Jacques then drugged, raped, and murdered Brooke.

Four days later on June 29, 2008, police discovered the e-mails from Eric and Charles to J1 and traced them to Jacques's computer. Jacques was then arrested and detained on a state charge of sexually assaulting J1. On July 1, 2008, a federal criminal complaint was filed charging Jacques with the kidnapping of Brooke, and, on July 2, her body was discovered. At his initial appearance on July 7, the court appointed the Office of

the Federal Public Defender to represent Jacques on the federal kidnaping charge.

On July 4 and 8, while in custody, Jacques sent letters to his friend Michael Garcia. These letters asserted Jacques's innocence and asked Garcia for help. On July 10, Jacques called Garcia and asked him to come from Arizona to Vermont, stating that he could not talk to Garcia on the monitored prison phone. He also suggested that Garcia pose as Jacques's attorney in a civil matter and call on the attorney line, which was not monitored. The next day, Garcia contacted the authorities. The government obtained a recording of the phone conversation between Jacques and Garcia. A "taint team" consisting solely of government agents and attorneys not working on the case pending against Jacques was assigned to investigate.

On July 13, Jacques called Garcia again and asked him to call on the prison's attorney line, stressing that time was of the essence and that Garcia was Jacques's last hope. Jacques followed up with another letter, dated July 14, requesting Garcia's help and assuring him that it would require only a few e-mails and text messages.

On July 16, FBI agents met with Garcia and helped him place a recorded telephone call to Jacques on the attorney line. Prior to the call, the agents instructed Garcia not to ask Jacques anything about the crimes charged. During the call, Jacques told Garcia that he was being framed by some "bad guys" who were involved with J1. Jacques said that he needed Garcia to

9

send messages to J1 telling her that the bad guys were still out there.  To accomplish this, Jacques gave Garcia J1's cell phone number and suggested what he should say in messages to her.  After this conversation, Jacques again sent Garcia letters begging for his help and expressing dismay that Garcia had not contacted him again.

Garcia called Jacques on July 22, a call again recorded by the FBI.  Jacques stated that the "plan" to contact J1 needed to be carried out soon because the indictment had not yet issued.  He also instructed Garcia to take precautions, such as using a secondary hard drive or sending e-mail messages from internet cafes, to prevent the messages from being tracked back to Garcia.  Garcia made yet another recorded call to Jacques on July 24, during which Jacques again asked Garcia to contact J1 and told Garcia that he had mailed a package to him that would explain what steps he should take.

The package of instructions told Garcia to send J1 messages in the names of Eric and Charles from Breckenridge.  The messages would instruct her to inform the authorities and the media that Jacques had been framed and to tell Jacques's wife that he had been framed.  Garcia was instructed, if necessary, to e-mail J1 as Eric, telling her to send "editorials" to major newspapers stating that Jacques was innocent.  Jacques also gave instructions on the timing of these steps and recommended that Garcia send these e-mails from public computers in other states.

10

The next recorded conversation between Jacques and Garcia took place on July 28. Garcia told Jacques that he was flying to Vermont to meet him. Jacques instructed Garcia on how to visit the facility posing as his attorney. The FBI again instructed Garcia not to initiate any inquiries about the charges pending against Jacques or to talk about Jacques's lawyers. On July 30 and 31, Garcia visited Jacques in prison, where their conversations were recorded by the FBI. During these conversations, Jacques sought confirmation of Garcia's receipt of the package, reiterated that Garcia should use a second hard drive or public computer to send the messages to J1, and told Garcia to expect to be contacted by the authorities.

Throughout these telephone calls and meetings, Jacques frequently asserted that he was innocent; that he was set-up by Breckenridge, who planted evidence in the form of Google searches, e-mails, and orders of items such as handcuffs; and that he had simply dropped Brooke off at the convenience store the morning that she had gone missing. Garcia asked two clarifying questions and told Jacques that he would assist with the plan.[2] On one occasion, contrary to the FBI's instructions, Garcia actively sought information unrelated to what Jacques was already telling him. The question concerned Jacques's prior criminal conduct allegedly committed during the early 1980's about which Garcia was curious.

[2] As noted by the district court, when Jacques stated that the actual killers had planted evidence, Garcia asked "[W]hat did they do? What, what kind of evidence?", to which Jacques was largely unresponsive. Garcia also asked whether Jacques's arrest occurred at the time Brooke's body was found.

After these meetings, the taint team sent copies of Jacques's packet of instructions and transcripts of the phone calls to Jacques's defense counsel, along with a letter explaining the events and giving counsel ten days to object before the taint team provided the materials to the prosecution. The defense did not object within the ten days.

Jacques moved to suppress this evidence as obtained in violation of his Sixth Amendment rights. Noting that kidnapping and obstruction of justice were separate charges, the district court stated that this evidence would "clearly be admissible at a separate trial for obstruction of justice" but nevertheless concluded that the evidence was inadmissible in the present prosecution.

The district court concluded that the government had knowingly circumvented Jacques's right to counsel on the kidnapping/rape/murder charges under Massiah v. United States, 377 U.S. 201 (1964). The court reasoned that it was foreseeable that Jacques would confide in Garcia due to their longstanding friendship and that incriminating evidence about the current charges would be obtained because the obstruction plan was focused on avoiding those charges.[3]

---

[3] The government also disputes the district court's conclusion that, based on Estelle v. Smith, 451 U.S. 454 (1981), the suppression of evidence obtained in violation of the Sixth Amendment applies to the penalty as well as the guilt phase of a capital case. Given our disposition of this matter, we need not, and do not, address this issue.

12

2) Discussion

The facts pertinent to Jacques's Sixth Amendment claim are embodied in correspondence and recorded conversations and are, therefore, undisputed. The question of whether the district court applied the correct legal standard to those facts is a question of law to be resolved de novo. See United States v. Vasquez, 389 F.3d 65, 75 (2d Cir. 2004). We turn, therefore, to that standard.

"[A]fter the . . . right to counsel attaches and is invoked, any statements obtained from the accused during subsequent police-initiated custodial questioning regarding the charge at issue . . . are inadmissible." McNeil v. Wisconsin, 501 U.S. 171, 179 (1991). This exclusionary rule applies not only to questioning by identified police officers, but also to statements obtained where the government uses "an undercover agent to circumvent the Sixth Amendment right to counsel." Illinois v. Perkins, 496 U.S. 292, 299 (1990).

However, "a defendant does not make out a violation of [the Sixth Amendment] simply by showing that an informant, either through prior arrangement or voluntarily, reported his incriminating statements to the police." Kuhlmann v. Wilson, 477 U.S. 436, 459 (1986). Rather, a defendant's rights are violated only when the government uses "investigatory techniques that are the equivalent of direct police interrogation." Id. Therefore, the Sixth Amendment does not "forbid[] admission in evidence of

13

an accused's statements to a jailhouse informant who was 'placed in close proximity but [made] no effort to stimulate conversations about the crime charged.'" Id. at 456 (alteration in original)(quoting United States v. Henry, 447 U.S. 264, 271 n.9 (1980)). Instead, a "defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." Id. at 459.

Moreover, the government does not violate the Sixth Amendment rights of a defendant charged with a crime by investigating or interrogating that defendant with regard to a separate crime that has not been charged. See Maine v. Moulton, 474 U.S. 159, 180 (1985). This is true even where the latter crime is "'factually related' to a charged offense," so long as the offense being investigated is not considered the "same offense" for the purposes of determining the applicability of the Fifth Amendment's Double Jeopardy Clause. Texas v. Cobb, 532 U.S. 162, 168, 172-73 (2001).[4]

_____

[4] Prior to the Supreme Court's opinion in Cobb, several circuits had interpreted the opinions in Brewer v. Williams, 430 U.S. 387 (1977), and Moulton to suggest that a defendant's Sixth Amendment right extends to charges under investigation that are "so inextricably intertwined . . . that the right to counsel for the pending charge cannot constitutionally be isolated from the right to counsel for the uncharged offense." United States v. Covarrubias, 179 F.3d 1219, 1223-24 (9th Cir. 1999) (collecting cases). That conclusion was explicitly rejected by the Court. See Cobb, 532 U.S. at 168, 172-73.
However, incriminating statements relating to a charged offense obtained during an investigation of a separate offense are "inadmissible at the trial of [the charged offense], . . . if, in obtaining this evidence, the State violated the Sixth Amendment by knowingly circumventing the accused's right to the assistance of counsel." Moulton, 474 U.S. at 180.

14

Therefore, it is not enough to show a foreseeability that Jacques's friendship with Garcia would lead Jacques to say things he would not say to someone identified as a law enforcement agent. To prove a violation of the Sixth Amendment, Jacques must also show that Garcia took actions amounting to an "indirect and surreptitious [interrogation]" of Jacques with regard to the kidnapping/rape/murder offenses. Kuhlmann, 477 U.S. at 458 (internal quotation marks omitted). In our view, Garcia took no such actions.

Unlike Henry, where a jailhouse informant who was paid for producing only useful information on pending charges had ingratiated himself with a fellow prisoner through conversations, 447 U.S. 264, 270, 274 n.12 (1980), or Moulton, where a cooperating defendant feigned forgetfulness and reminisced with a co-defendant about the charged conduct, 474 U.S. at 165-66, Garcia never took any initiative that elicited information from Jacques concerning the charged offense. To be sure, Jacques invited conversations with Garcia because of their friendship, but these conversations were at Jacques's initiative -- actually, insistence -- not Garcia's. Indeed, Garcia was entirely passive while Jacques was insisting on explaining to Garcia how to help him.

Nor were the few questions that Garcia asked during his conversations with Jacques of a probing nature with regard to the kidnapping/rape/murder charges. We have previously declined to

15

decide whether "limited follow-up questions could be found to 'stimulate' discussion," United States v. Rommy, 506 F.3d 108, 136 (2d Cir. 2007), and need not do so here.  Garcia's infrequent questions did "not alter the fundamental nature of the exchange between the two men:  namely, [Jacques] enlist[ing] [Garcia's] help."  Matteo v. Superintendent, SCI Albion, 171 F.3d 877, 896-97 (3d Cir. 1999).  From beginning to end, the conversations focused on Jacques's using Garcia to influence J1's statements and providing Garcia with the information that Jacques believed was necessary to accomplish that goal.  Id. (finding no deliberate elicitation when an incarcerated defendant asked a friend to retrieve evidence and the telephone calls concerning that request were recorded by the government with the friend's consent).[5]

To be sure, the FBI actively assisted Garcia in making calls on the attorney line and in visiting Jacques in prison.  However, those acts are not "the equivalent of direct police interrogation."  Kuhlmann, 477 U.S. at 459.  When prison authorities place an informant in close proximity to a defendant, even when expecting the defendant to divulge incriminating information, id. at 456, the Sixth Amendment is not violated unless the informant actively elicits statements that are incriminating with regard to charged crimes.  Id. at 459.

---

[5] Garcia's inquiry concerning the charges against Jacques in the early 1980's clearly elicited information; however, that information concerned a crime other than those charged.  See McNeil, 501 U.S. at 175 (the Sixth Amendment is offense specific).

Moreover, neither Garcia nor the FBI selected use of the attorney line or prison visits as the means of communication. Rather, it was Jacques who selected them. Garcia and the FBI simply allowed Jacques to undertake his own chosen course of action.

Finally, the fact that Garcia represented that he was willing to assist in the obstruction scheme did not violate Jacques's rights with regard to the underlying charges. Garcia's assent did not seek to elicit a response, because merely expressing agreement is not comparable to "engaging the defendant 'in active conversation.'" Kuhlmann, 477 U.S. at 459 (quoting Moulton, 474 U.S. at 177, n.13); see also Matteo, 171 F.3d at 895–97.

In sum, Jacques shared information on his own initiative and on his own terms. Therefore, the government did not take any "action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." Kuhlmann, 477 U.S. at 459.

CONCLUSION

For the foregoing reasons, we affirm the exclusion of the allegations with regard to J2 and J3, vacate and remand with regard to the allegations concerning J4, and vacate the order suppressing evidence of the alleged plan to obstruct justice.

17