GREGORY, Circuit Judge,
dissenting:
The majority opinion denies Mr. Umaña the right to confront his accusers in a jury proceeding to determine whether he lives or dies. The right to confront one’s accusers is a right as old as it is important. Cf. Acts 25:16 (“[I]t is not the Roman custom to hand over anyone before they have faced their accusers ... ”). The Sixth Amendment guarantees a defendant the right “to be confronted with the witnesses against him” “in all criminal prosecutions.” U.S. Const. amend. VI. It also guarantees the right to an attorney, jury factfinding, notice of the crimes of which a defendant is accused, and a trial in the venue where the crime was committed. Id.
The last four of these Sixth Amendment rights — counsel, jury, venue, and notice — • are not at issue today, nor are they controversial. During Federal Death Penalty Act (“FDPA”) proceedings, a defendant cannot be sentenced to death without these Sixth Amendment rights. However, under the majority’s holding today, capital defendants are denied the right to confront their accusers throughout certain stages of an FDPA proceeding. In contravention of the history and text of the Confrontation Clause, and in spite of modern Supreme Court jurisprudence emphasizing the importance of the Confrontation Clause, the majority strips Umaña of the Sixth Amendment right most important for ensuring the accuracy of trial outcomes during the most important proceeding of his life.
This is an important constitutional question that the Supreme Court has not yet resolved, though three circuits have wrestled with the issue. See Muhammad v. Sec’y, Fla. Dep’t of Corr., 733 F.3d 1065 (11th Cir.2013) (finding that Confrontation Clause does not apply to capital cases after guilty verdict); Szabo v. Walls, 313 F.3d 392, 398 (7th Cir.2002) (same); United States v. Fields, 483 F.3d 313, 324-338 (5th Cir.2007) (same); Proffitt v. Wainwright, 685 F.2d 1227, 1252-53 (11th Cir. 1982) (finding a right to cross examine the author of a psychiatric report under the Sixth Amendment during sentencing) modified, 706 F.2d 311 (11th Cir.1983) (expressly limiting case to psychiatric reports).[1] This is an issue of first impression in this circuit, though we have held that the Confrontation Clause does not apply in non-capital sentencing. United States v. Powell, 650 F.3d 388, 392-93 (4th Cir .2011).
“Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment.” Woodson v. North Carolina, 428 U.S. 280, 305, 96 S.Ct. 2978, 49 L.Ed.2d *361 944 (1976) (plurality opinion). I would refuse to strip a defendant of the Confrontation Clause right — a right whose “very mission ... is to advance the accuracy of the truth-determining process in criminal trials” — at a proceeding in which a jury must decide whether a man lives or dies. United States v. Inadi, 475 U.S. 387, 396, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986) (internal quotation marks and citations omitted). Accordingly, I dissent.
I.
I begin with some of the factual background that provides the foundation for my reasoning. First, one must understand the unique structure of FDPA trials, which illustrates that the Confrontation Clause should not disappear simply because a defendant is accused of a crime at a later stage of his judicial proceedings. Second, one must understand the nature of the accusations made in this particular case. Mr. Umaña was sentenced to death largely based on unconfronted testimony that was as damning as it was dubious.
The FDPA requires three jury findings before a criminal defendant can be killed by the federal government. First, the defendant must be found guilty of a death-eligible crime. 18 U.S.C. § 3591. Second, a factfinder must decide whether one of several aggravating factors exists. The factors that make a defendant eligible for death are listed by statute. 18 U.S.C. § 3593(e). Third, if such an aggravating factor is found, the factfinder must finally decide whether all aggravating factors outweigh all mitigating factors. Id. Unless the factfinder makes the requisite findings in each of the three stages, death is not within the permissible range of sentences.
In this case, the district judge trifurcated the proceedings so that each of the above steps was conducted separately. J.A. 3224. In the second phase, the government only sought to prove that Mr. Umaña met two statutory aggravating factors: an attempt to kill more than one person in a single criminal episode, and the knowing creation of a grave risk of death to more than one person. J.A. 2631; see 18 U.S.C. § 3592(c)(5), (c)(16). In the third phase, the government sought to prove four more aggravating factors. J.A. 3543-45. Most relevant in this case, and what ultimately became the keystone of the government’s argument, was whether Mr. Umaña had been involved in other acts of violence not reflected in his criminal record, specifically two separate incidents of murder in Los Angeles. J.A. 3544. The primary evidence for these crimes was a series of transcripts of police interrogations in which accomplices of Umaña who were with him during the first of two Los Angeles murder incidents claim that Umaña was the only member in their group who fired a weapon that killed two teenagers. Umaña had no opportunity to cross-examine these witnesses.
The FDPA provides a set of safeguards that applies to evidence at capital sentencing, though constitutional safeguards also apply. See Estelle v. Smith, 451 U.S. 454, 462-63, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981). While evidence presented need not comport with the entirety of the Federal Rules of Evidence, information must nonetheless be excluded “if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury.” 18 U.S.C. § 3593; accord Fed.R.Evid. 403. In addition, the FDPA explicitly provides for rights echoing those of the Sixth Amendment. The FDPA requires that the government attorney give notice of the specific aggravating factors that will be used to justify a death sentence. Compare § 3593(a) with U.S. Const, amend. VI (“[T]he accused shall enjoy the right ... to *362 be informed of the nature and cause of the accusation.”). The defendant is given the right to a jury. Compare § 3593(b) with U.S. Const. amend. VI (“[T]he accused shall enjoy the right to a speedy and public trial, by an impartial jury.”). However, the statute is silent on other Confrontation Clause rights. See generally 18 U.S.C. §§ 3591-99. Importantly, the fact that the FDPA is silent on certain constitutional rights does not mean that those rights do not exist or that the Act is unconstitutional. See United States v. Fulks, 454 F.3d 410, 437-38 (4th Cir.2006); United States v. Sampson, 486 F.3d 13, 22-23 (1st Cir. 2007).
Finally, in addition to understanding the structure of FDPA trials, it is important to emphasize that the unconfronted testimony used against Umafia was as critical to the government’s ease as it was inherently suspect. In Bruton v. United States, a co-defendant’s accusation against the defendant was introduced as evidence by a separate witness. 391 U.S. 123, 124, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). In finding a violation of the Confrontation Clause, the Court noted that accusations from co-defendants facing punishment for the same crime are not only “devastating to the defendant but their credibility is inevitably suspect ... given the recognized motivation to shift blame onto others.” Id. at 136, 88 S.Ct. 1620. A review of the record in this case demonstrates both how “devastating” and how “suspect” such accusations can be. Id.
First, the accusations were devastating: the government made the evidence of multiple previous murders the centerpiece of its case for the death sentence. Nearly every page of the transcript of the government’s summation argument in the third phase of the trial focuses on these unconfronted accusations of murder. See, e.g., J.A. 3402 (“[Umafia] had killed before”); J.A. 3403 (“[ Umafia] had earned those two letters on his forehead and he earned them by killing”); J.A. 3404 (“[Umafia] ... had killed before. And he was going to kill again.”); J.A. 3405 (claiming to jury that Umafia thought “I’ve done this before. I know what I have to do.”); J.A. 3406 (claiming to jury that Umafia thought “I know they were dead because I know what dead is. I’ve killed before.”); J.A. 3407 (“We know he’s killed before.”); J.A. 3408 (“Does that [previous murder] story sound familiar? ... Sure it sounds familiar because that’s exactly what happened later in Greensboro.”); J.A. 3409 (arguing that Umafia thought to himself, “I’m Wizard from MS-13. We need to go out and we need to take care ... of the people in [Lemon Grove Park]. And that’s exactly what he did.”); J.A. 3411 (pointing to “the two that you heard a lot of evidence on, the two additional — the three additional murders”).
The record also reveals that the accusations, though “devastating,” were “suspect.” Bruton, 391 U.S. at 136, 88 S.Ct. 1620. For the first Los Angeles murder incident, in which a group of MS-13 members exited a car to shoot two teenagers who had flashed rival gang signs, there is conflicting eyewitness evidence on Umafia’s role. Two eyewitnesses with no role in the altercation stated to police that the shooter was the driver of the car. However, three of Umafia’s fellow gang-members who were in the car with him claimed that Umafia was the shooter, but also stated that Umafia was not the driver. Thus, for this murder allegation, the only evidence linking Umafia to the crime was given by three potential co-defendants with a strong incentive to push the blame onto Umafia. Neutral eyewitnesses, meanwhile, suggest that Umafia was not the shooter.
The only other inculpatory evidence for these two murders is from Umafia himself. *363 Police officers from Los Angeles who were investigating these murders interviewed Umaña in North Carolina after Umaña had been arrested for the murder of the Salinas brothers. These officers told Umaña that he might as well admit to the Los Angeles murders because, given that he was facing a mandatory life sentence for the North Carolina murders, it would make no difference if he claimed responsibility for the prior crimes. After denying that he was responsible for the prior murders at length, Umaña eventually gave in to the interrogation, albeit with an equivocal, unclear statement:
Officer: Did you shoot him? Tell me, tell me face to face. Did you shoot him?
Umaña: Say that, that I did it. Right? I really didn’t do it, right?
Officer: You did it?
Umaña: To say it like that.
Officer: No. Not just to say it, but to say the truth ...
Umaña: To say the truth? ... [ laughs]
Officer: You did it? Not out of meanness, but because you thought they were, were gang members.
Umaña: Ah ...
Officer: Is that right?
Umaña: Yes.... And that is[,] that is the point that mattered to him? [Laughs]?
J.A. 4382-83.
Umaña was also linked to a third murder that occurred in Lemon Grove Park. Two pieces of evidence link Umaña to this crime. First, the same gun was used in this murder as was used in the previous Los Angeles murders, at which Umaña was present. This evidence is weak in light of expert testimony during trial suggesting that MS-13 gang members share their firearms as a matter of course. That said, Umaña admits to having been present at both murders, which gives more weight to the fact that the same murder weapon was used. However, while “there is no evidence that anyone else was present at both murder sites,” Maj. Op. at 349, there were apparently one or two dozen people at the scene of the second murder, and the identities of these people are unknown. Thus, Umaña was present at both murders, but it is speculation to conclude that no one else was as well.
In addition to this circumstantial evidence, there is weak eye-witness evidence that implicates Umaña in the Lemon Grove Park murder. The witness, a member of a rival gang, twice picked Umaña out of a photo lineup. In 2005, the witness chose Umaña’s picture out of a six-person photo lineup, but only concluded that “I remember seeing this guy but I’m not sure if he is the.one that came that day to the park.” J.A. 4060. Three years later, the witness again picked Umaña’s picture out of a lineup, but again expressed uncertainty, noting that “I’m not 100% sure,” because “everything happened so fast.” J.A. 4057. The witness clarified that “what I saw was the gun and after that I began to run.” Id. This witness testified during sentencing, where he noted that the shooting occurred after 9 p.m. on a basketball court where the overhead lights had been turned off. Thus, while Umaña has been linked to another Los Angeles murder, the best evidence of this link is from a witness who saw the shooter from twenty feet away at night with at best partial lighting. Further, this witness admitted that he only saw a gun before taking off running in the opposite direction. This witness has never been able to make an identification nearing 100% certainty.
Finally, and most problematic, the government introduced evidence linking Umaña to murders in El Salvador, even though this evidence had been ruled as inadmissible and even though Umaña had no chance *364 to confront his accusers. At sentencing, the government sought to introduce evidence that Umaña had committed violent crimes, including homicide, in El Salvador. Specifically, the government wanted to call an El Salvadoran prosecutor to testify. The district court denied the government’s motion, concluding that the evidence “lacks sufficient indicia of reliability” and that “its probative value is outweighed by a danger of unfair prejudice.” J.A. 3232.
•Incredibly, in spite of the district court’s clear ruling, the government introduced a transcript as evidence in which a United States law enforcement officer is quoted as saying “I know he’s done stuff in El Salvador,” J.A. 4301, “[w]e know ... that they were looking for you for homicide also in El Salvador,” J.A. 4316, and “[w]e know that he’s, he’s a violent, violent guy. We know that he’s wanted in El Salvador ... for many violent crimes ... I know he’s a shooter. I know he’s an enforcer. I know he’s a gangster,” J.A. 4315. Through an evidentiary back door left wide open, the government snuck in testimony that “lacked consistency and credibility,” per the district court, but had enough prejudicial value that the government made its entire case at sentencing about Umaña’s past uncharged homicidal conduct.
In sum, the evidence linking Umaña to previous murders was as powerful as it was problematic. For both the Los Angeles and El Salvador murders, there was not enough evidence for prosecutors to bring a case or sustain a conviction in stage one of an FDPA trial. Unfazed, the government simply bided its time until the third stage of the trial, when, per the district court’s ruling and the majority opinion today, important constitutional safeguards disappear. Umaña filed a timely objection at sentencing, arguing that his Sixth Amendment rights were violated.
II.
Turning to the merits, an understanding of the history and purpose of the Confrontation Clause, as well as an analysis of the Supreme Court’s recent jurisprudence on the Confrontation Clause and Sixth Amendment factfinding, shows that the government violated Umaña’s constitutional rights when he was sentenced to death without a chance to confront his accusers. District courts cannot dodge the constitutional guarantee of confrontation by splitting a capital trial into three segments and waiting until the third segment to strip a defendant of his Sixth Amendment rights. Further, because the Sixth Amendment right at issue here — the right of cross-examination — is “the constitutionally prescribed method of assessing reliability,” Crawford v. Washington, 541 U.S. 36, 62, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), it is especially offensive to the Constitution to deny a defendant this right during the very stage of the proceedings in which a jury must decide whether he deserves to live or be killed.
I begin with the text of the Sixth Amendment, but conclude that the words themselves do not settle the matter. “In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him.” U.S. Const, amend. VI. Because the FDPA did not exist at the time of the founding, the Sixth Amendment is silent on the distinction between different stages of FDPA trials. While the right applies to all criminal prosecutions, the text does not give guidance on when a criminal prosecution ends.
An analysis of the history leading to the Sixth Amendment is more helpful. The historical developments that led to the Confrontation Clause weigh in favor of its application at all stages of FDPA trials. In the leading case on modern Confronta *365 tion Clause doctrine, the Supreme Court explained that the Confrontation Clause right “is most naturally read as a reference to the right of confrontation at common law, admitting only those exceptions established at the time of the founding.” Crawford, 541 U.S. at 54, 124 S.Ct. 1354. The FDPA sentencing regime did not exist at the time of the founding, nor was there an analogous system. Rather, at the time when the Confrontation Clause was crafted, a death sentence flowed automatically from convictions for certain capital felonies. See United States v. Fields, 483 F.3d at 370 (Benavides, J., dissenting); see also 1 Stat. 112-19 (defining a series of federal crimes and mandating a death sentence upon conviction for certain capital crimes); Rory K. Little, The Federal Death Penalty: History and Some Thoughts About the Department of Justice’s Role, 26 Fordham Urb. L.J. 347, 360-65 (1999). Thus, there was no separate hearing to determine whether death was appropriate. See Woodson, 428 U.S. at 289, 96 S.Ct. 2978 (1976). When capital trials are structured in this way, no defendant receives a death sentence after a trial in which he is denied the Confrontation Clause right, nor is any defendant sentenced to death on the basis of unconfronted accusations of prior crimes. “By the time the Bill of Rights was adopted,” “the jury determined which homicide defendants would be subject to capital punishment by making factual determinations.” Ring, 536 U.S. at 599, 122 S.Ct. 2428 (quoting Walton v. Arizona, 497 U.S. 639, 710-11, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990) (Stevens, J., dissenting)). These factual determinations could only be made in proceedings in which the Confrontation Clause applied in full force. Thus, at the time of the founding, there was no exception to the Confrontation Clause right for capital sentencing.[2]
Crawford lends further support to the idea that, based on the purpose of the Confrontation Clause, the right to confront adverse witnesses extends to every stage of an FDPA trial. In discussing the history of the clause, the Supreme Court noted that the common law right to confrontation developed in response to abuses in certain infamous trials in England. In these notorious cases, defendants were convicted, and sometimes executed, without the right to examine their accusers. Crawford, 541 U.S. at 43-45, 124 S.Ct. 1354. One of “[t]he most notorious instances” of such abuses occurred in the treason trial for Sir Walter Raleigh. Id. at 44, 124 S.Ct. 1354. In concluding that a judge’s reliability ruling cannot substitute for the right to confrontation, the Court noted that “[i]t is not plausible that the Framers’ only objection to the trial was that Raleigh’s judges did not properly weigh [reliability] factors before sentencing him to death. Rather, the problem was that the judges refused to allow Raleigh to confront [the key government witness] in court.” Id. (emphasis added). Thus, part of the reasoning motivating Crawford was the desire to reject any interpretation of the Confrontation Clause which would lead to the same abuses seen in the Raleigh trial. Further, the Court emphasized that what made that infamous case so odious was the lack of a confrontation right before Raleigh was sentenced to death.
Mr. Umaña now finds himself in the same position as Raleigh, stripped of his right to confront face-to-face those whose *366 words would condemn him to die. Powerful accusations were made against Umaña, and though these accusations were not the basis for the initial guilty verdict, they ultimately helped form the basis for his capital sentence. Further, like Raleigh, Umaña lacked the opportunity to confront his accusers before the death sentence was issued. The distinction between the cases is that Sir Walter Raleigh was sentenced to death after a unitary proceeding in which guilt and penalty were decided simultaneously. In Umaña’s case, meanwhile, the judge trifurcated the trial and ensured that any constitutional protections had been severed by the time of stage three, in which a jury weighs whether death is the appropriate sentence. If the judicial proceeding that led to Sir Walter Raleigh’s execution is unconstitutional, as it no doubt is, then it is unclear why the same situation would lead to a different result merely because the court artificially cabins the proceeding in which the constitutional abuse occurs.
Recent Supreme Court case law on Sixth Amendment rights in sentencing further buttresses this view. In Ring v. Arizona, the Supreme Court considered whether the right to jury factfinding applies for aggravating factors necessary to apply a death sentence, which would be the equivalent of the second stage of an FDPA trial. 536 U.S. 584, 608-09, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). The Court held “that the Sixth Amendment applies to” this stage of death sentencing: defendants have the right to jury factfinding for such factors. Id. at 609, 122 S.Ct. 2428. Granted, Ring does not control here, since this case concerns the introduction of unconfronted testimony in the third stage of FDPA trials. The majority finds this distinction key, arguing that once a defendant is found death-eligible in stage two of an FDPA trial, “the jury exercises discretion in selecting a life sentence or the death penalty, and any facts that the jury might find during that phase do not alter the range of sentences it can impose.” Maj. Op. at 347. This is incorrect. Under the FDPA, a jury cannot impose a death sentence until it finds that “all the ... aggravating factors found to exist sufficiently outweigh all the mitigating factors.” 18 U.S.C. § 3593(e). Only when a jury finds that aggravating factors sufficiently outweigh the mitigating factors may it impose a death sentence under the FDPA. Thus, while stage three of FDPA trials involves some jury discretion, juries must nonetheless make certain factual findings in this final stage before a death sentence can be imposed.
Put another way, the jury’s burden in stage three — a finding that the aggravating factors sufficiently outweigh the mitigating factors — “is not optional.” Green, 372 F.Supp.2d at 177. “Because we will never know exactly how each factor influences the jurors’ ultimate punishment determination, logic dictates that all aggravating factors — together—be considered legally essential to the punishment.” Id. As in Green, “the government’s argument that non-statutory factors are not essential is disingenuous; if the government does not require additional evidence to convince the jury to vote for death, why is it invoking non-statutory factors at all?” Id. In this case, the proof is in the pudding: the government pointed to the past murders on nearly every page of the transcript of its closing argument at sentencing. Without these past murders, it is doubtful that the government could meet the burden necessary to apply the death penalty under the FDPA. As such, the permissible range of sentencing is increased in this stage, indicating that Sixth Amendment rights do apply. See also Sablan, 555 F.Supp.2d at 1221 (“[Ujnder the structure of the FDPA, it is not the finding of a *367 statutory aggravating factor that actually increases the punishment. The fact that actually increases the punishment is the existence of all the aggravating factors found by the jury (taken together).”).
The majority argues that Williams v. New York, 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949), a pre-Crawford, preRing Supreme Court case, directly disposes of the issue before us. That case is neither on point nor persuasive, and in any event, its power is dubious in light of more recent Supreme Court jurisprudence. In Williams, the Supreme Court upheld a death sentence that relied in part on a probation report that implicated the defendant in prior crimes. Id. at 243, 69 S.Ct. 1079. The Court continues to cite Williams for the proposition that sentencing decisions contain an element of discretion and can rely on evidence that would not be admissible at trial. See, e.g., Pepper v. United States, — U.S. -, 131 S.Ct. 1229, 1235, 179 L.Ed.2d 196 (2011). We have cited to Williams for the similar concept that sentencing courts “must have recourse to a much broader array of information than we allow the trier of fact to consider in determining a defendant’s guilt.” Powell, 650 F.3d at 391-92.
Nonetheless, Williams is not controlling, because that case is a pre-incorporation, pre-FDPA case concerning a state death sentence. That is, Williams was not a Confrontation Clause case at all, but rather a Due Process Clause case, and it considered a state capital sentencing regime, not the federal one used for Mr. Umaña. Williams, 337 U.S. at 252, 69 S.Ct. 1079. Nothing in the holding of Williams dictates that the Confrontation Clause does not apply to the third stage of FDPA trials. Rather, the holding in Williams merely means that it does not offend due process for a state judge to rely on unconfronted hearsay in death sentencing. This is different from a ruling that a far more specific clause of the constitution permits a jury to rely on such evidence in a proceeding to decide whether the death sentence can be applied. Further, the decisions cited above — concerning the Sixth Amendment right to factfinding at sentencing, death penalty procedure, and the Confrontation Clause — all suggest that even if Williams is not dead letter, it should not be extended to apply to FDPA proceedings on Sixth Amendment grounds.
.Even though Williams is not on point, the majority nonetheless argues that its spirit is intact. That is, Williams embodies the idea that the Confrontation Clause should not apply because “modern concepts individualizing punishment have made it all the more necessary that a sentencing judge not be denied an opportunity to obtain pertinent information by a requirement of rigid adherence to restrictive rules of evidence.” Id. at 247, 69 S.Ct. 1079.
This argument is internally consistent, but it elides a far more important principle of capital sentencing, which is the need for reliability. As the Supreme Court has noted, death is such a weighty punishment and so different from a prison term that “there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment.” Woodson, 428 U.S. at 305, 96 S.Ct. 2978 (plurality opinion). Thus, greater access to information for the sentencing court is but one principle of death sentence jurisprudence — a principle that gives way to the more important principle that a death sentence be based on accurate factfinding. Further, as discussed above, the Supreme Court has explained that “the Confrontation Clause’s very mission ... is to advance the accuracy of the truth-determining process in criminal trials.” United States v. Inadi, 475 U.S. 387, 396, 106 *368 S.Ct. 1121, 89 L.Ed.2d 390 (1986) (internal quotation marks and citations omitted). Taken together, the Supreme Court’s parallel jurisprudence on the Confrontation Clause and on the need for reliability in death sentences demonstrates why Umafia’s sentence must be reversed. Death sentences must stand on reliable ground, and the Confrontation Clause is “the constitutionally prescribed method of assessing reliability.” Crawford, 541 U.S. at 62, 124 S.Ct. 1354.
Further, in striking the balance between the desire for more evidence and the unquestionable need for reliability in death sentences, it is important to note that the Confrontation Clause right will not only enhance reliability — it will do so at a small practical cost, contrary to the concerns voiced by the majority. The majority frets that if we recognize Mr. Umafia’s Sixth Amendment rights through each stage of an FDPA trial, we would “ ‘endlessly delay criminal administration in a retrial of collateral issues.’ ” Maj. Op. at 347 (quoting Williams, 337 U.S. at 250, 69 S.Ct. 1079). To the contrary, the Confrontation Clause applies only to testimonial evidence, and would only be implicated in a narrow range of aggravating factors, suggesting that recognizing Mr. Umafia’s Sixth Amendment right will not “endlessly delay criminal administration of collateral issues.” Maj. Op. at 347 (quoting Williams, 337 U.S. at 250, 69 S.Ct. 1079). As recognized in Crawford, the Confrontation Clause only reaches “material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially.” Crawford, 541 U.S. at 51, 124 S.Ct. 1354. Even testimonial evidence continues to be admissible so long as the defendant has a prior chance to cross-examine the witness and the witness is unavailable. Id. at 51-52, 124 S.Ct. 1354. Thus, the vast majority of the evidence in Mr. Umafia’s case, and in most FDPA trials, would be unaffected by recognizing Mr. Umafia’s Sixth Amendment right. Only for a narrow range of aggravating factors, related to uncharged prior crimes, would the Confrontation Clause be implicated, and even then only some of the time.
In any case, given that the prosecution made Mr. Umafia’s uncharged prior crimes the centerpiece of its capital case in the final stage of his FDPA trial, I cannot accept the majority’s conclusion that the unconfronted evidence used against Mr. Umafia was a mere “collateral issue[ ].” To the contrary, the government’s entire case for the death penalty relied on the accusation that Umafia “had killed before.” J.A. 3404. In sum, Mr. Umafia’s Sixth Amendment right to confrontation provides enormous benefits in terms of reliability in capital sentencing, and this benefit comes at a small cost — limiting only very specific types of aggravating information.
The majority supports its ruling by pointing to “the policy of presenting full information to sentencers,” Maj. Op. at 347, but this reasoning creates an evidentiary loophole that turns FDPA trials upside-down. Unquestionably, a sentencing court must have access to information not relevant to guilt in order to ensure that punishments are individualized. While this general proposition is valid, applying it blindly in this case is problematic because it lumps together evidence like a defendant’s 4th grade report card with evidence of murder. In a typical criminal trial, the most serious crime gets proven at a guilt trial, where the full panoply of constitutional and evidentiary rights apply. In the later sentencing stages, softer evidence, both negative and positive, is introduced, to allow for individualization of punishment. This structure makes sense: the *369 more serious an allegation, the more serious the protections given to a defendant.
Under the majority’s ruling, this structure is flipped. It would have been outrageous for the government to convict Umaña for the North Carolina murders without giving him his Sixth Amendment rights. Yet, the centerpiece of the government’s case for the death sentence was a series of uncharged murders that were in many ways more serious than the North Carolina incident. The third stage of an FDPA trial is typically reserved for evidence about the victims’ families or about the defendant’s elementary school performance or Boy Scout record. The jury must weigh these soft, more subjective factors to fit the punishment to the crime. The evidence we consider here is so much more severe than a 4th grade report card that it is different in kind, not degree. When a jury considers a Boy Scout record, the truthfulness and reliability of the evidence is a secondary matter at best. The more difficult task for this type of information is fitting it into a cohesive, complete picture of the defendant. The weight to be accorded to the evidence is the predominant inquiry, and its reliability is a lesser concern. In contrast, when a jury considers evidence of three additional murders, the reliability of the evidence is the predominant concern, whereas the weight to accord such evidence is much easier to discern. That is, it is easy to know how much weight to accord evidence of past murders because it completely overwhelms evidence like an elementary school report card, as the government’s closing argument demonstrates. Instead, for this type of evidence the most important inquiry is as to its truth and reliability. This distinction again shows why the district court committed legal error. The government is essentially exploiting the district court’s ruling to have a second murder trial, only without the restrictions that the Supreme Court mandated in Crawford and Ring. The majority’s ruling today lets the tail wag the dog, and it will encourage strategic posturing by prosecutors to punish defendants for crimes that could never be found beyond a reasonable doubt by a rational factfinder.
III.
The majority today strips a defendant of his Sixth Amendment right to confront his accusers. Further, it denies this right in a proceeding in which a jury must decide whether a human being is fit to live. In this, the most momentous decision a jury can make, the majority would do away with the “constitutionally prescribed method of assessing reliability” of evidence. Crawford, 541 U.S. at 62, 124 S.Ct. 1354.
Umaña is being sent to his death based on accusations by self-interested accomplices — self-interested accomplices whose testimony, at least in part, was contradicted by independent witnesses. This illustrates the Supreme Court’s admonition that accusations from co-defendants facing the same punishment are “devastating to the defendant.” Bruton, 391 U.S. at 136, 88 S.Ct. 1620. “The unreliability of such evidence is intolerably compounded when the alleged accomplice, as here, does not testify and cannot be tested by cross-examination. It was against such threats to a fair trial that the Confrontation Clause was directed.” Id. Because I conclude that the Confrontation Clause applies at every stage of an FDPA trial, not just the first two stages, and because I conclude that it is both wrong and unconstitutional for a death sentence to rest on unconfronted accusatory evidence, I dissent.

. In addition, district courts have addressed this issue, reaching conflicting results. Four district courts have found that the Clause applies. See United States v. Stitt, 760 F.Supp.2d 570, 581-82 (E.D.Va.2010); United States v. Sablan, 555 F.Supp.2d 1205 (D.Colo. 2007); United States v. Mills, 446 F.Supp.2d 1115, 1127-1129 (C.D.Cal.2006); United States v. Green, 372 F.Supp.2d 168, 175 (D.Mass.2005). Another district court found that the right applies, but this decision was vacated. United States v. Jacques, 768 F.Supp.2d 684, 698-700 (D.Vt.2011) vacated by United States v. Jacques, 684 F.3d 324, 330 (2d Cir.2012). Two district courts have found that the right applies only during the eligibility phase of sentencing, which is the second stage of FDPA trials. See United States v. Jordan, 357 F.Supp.2d 889, 903 (E.D.Va. 2005); United States v. Bodkins, CRIM. A. 4:04CR70083, 2005 WL 1118158 (W.D.Va. May 11, 2005).

. In non-capital sentencing, meanwhile, hearsay testimony was often used and proceedings were more informal, suggesting a distinction between capital and non-capital sentencing. John G. Douglass, Confronting Death: Sixth Amendment Rights at Capital Sentencing, 105 Colum. L.Rev.1967, 2016-17 (2005).